UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANDREW TUCKER,<br>    *Plaintiff* | :<br>:<br>: |
| v. | :    C.A. NO. 23- <br>: |
| BRIGHAM HEALTH AND<br>REHABILITATION CENTER, LLC, alias,<br>    and<br>BARBARA TOMOLONIUS,<br>    *Defendants*. | :<br>:<br>:<br>:<br>:<br>: |

**COMPLAINT**

## I.  Introduction

This is an action brought by the Plaintiff, Andrew Tucker, against the Defendants, Brigham Health and Rehabilitation Center, alias, and Barbara Tomolonius, seeking compensatory and punitive damages, counsel fees, costs, and other equitable relief arising out of violations of **Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq.* **("Title VII")**, the **Americans with Disabilities Act of 1990, 42 U.S.C. § 12101,** *et seq*. **("ADA")**, the **Massachusetts Fair Employment Practices Act, M.G.L. c. 151B § 1,** *et seq*. **("FEPA")**, and the **Massachusetts Health Care Whistleblower Act, M.G.L. c. 149 § 187,** *et seq*. **("HCWA").**

## II.  Parties

1. Plaintiff, Andrew Tucker, is a resident of Salem, New Hampshire.

2. Defendant, Brigham Health and Rehabilitation Center, LLC, alias, (hereinafter "Brigham Health", "BHRC", or "Defendant BHRC"), providing healthcare services, is a foreign limited liability company duly incorporated under the laws of the State of Delaware with a principal place of business located at 8301 Roosevelt Blvd, Philadelphia, PA 19152. Brigham Health is registered to do business within the Commonwealth of Massachusetts with a registered

Massachusetts office located at 155 Federal St., Suite 700, Boston, MA 02110, and a business location at Brigham Health and Rehabilitation Center, 77 High St, Newburyport, MA 01950, where Plaintiff was employed at all times relevant to this action.

3. Defendant 2, Barbara Tomolonius, (hereinafter "Defendant Tomolonius" "Defendant Barbara" or "Barbara"), resides in Newburyport, MA 01950, and at all times relevant to this action, was employed as Defendant Brigham's Director of Nursing Services, where she served as Plaintiff's direct supervisor at Defendant BHRC's location at 77 High St, Newburyport, MA 01950.

### III. Jurisdiction

4. This Court has federal subject matter jurisdiction over this case pursuant to the provisions of 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law; specifically, (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and (2) the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. ("ADA"). Supplemental jurisdiction over the state law claims set forth herein is predicated on 28 U.S.C. § 1367 as they arise out of the same case or controversy.

### IV. Venue

5. Pursuant to the requirements set forth in 28 U.S.C. § 1391, venue is proper in this Court insofar as Defendant, Brigham Health, is doing business in Massachusetts and therefore is deemed to reside in the District of Massachusetts. Defendant, Barbara Tomolonious, also resides in Massachusetts. Moreover, a substantial part of the acts and/or omissions giving rise to the claims asserted herein occurred in the District of Massachusetts.

### V. Exhaustion of Administrative Remedies

6. On or about June 30, 2021, Plaintiff filed a Charge of Discrimination with the

Massachusetts Commission Against Discrimination (MCAD) and the Equal Employment Opportunity Commission (EEOC) against Defendants alleging discrimination on the basis of sex, gender, and disability.

7. Thereafter, Plaintiff elected to terminate all proceedings before the MCAD and the EEOC and to have his case heard in Court.

8. On or about October 26, 2022, the RICHR issued Plaintiff a Notice of Right to Sue.

9. On or about October 31, 2022, the EEOC issued a Notice of Right to Sue.

10. Accordingly, Plaintiff has timely and properly exhausted his administrative remedies and thereby satisfied all pre-conditions to bringing the within action.

## VI. Material Facts

11. On August 2020, I began my employment with Brigham Health and Rehabilitation Center as a registered nurse.

12. I was one out of approximately 15 nurses who worked in my group. Only two (2) of the nurses, myself and one other individual, are male. 13 out of the 15 nurses are female. I was the only male nurse who worked the shift I was regularly scheduled; the rest of the nurses were female.

13. During the course of my employment, I did not observe any female nurses receive verbal or written discipline, including for instances of tardiness and cellphone use, despite multiple instances where female nurses were tardy and using their cellphone while working; this was known and allowed by Defendants.

14. At all relevant times, I performed my job satisfactorily.

15. Soon after I began my employment, I requested time off for paternity leave as I was expecting the birth of my first child.

16. On October 3, 2020, my first child was born. Unfortunately, my child immediately

required care within the neonatal intensive care unit (NICU). My child was in the NICU from October 3rd, 2020, to October 25th of 2020.

17. I notified my employer of my child's NICU situation. We agreed that I would return to work on Wednesday, October 28, 2020.

18. My supervisor, Barbara Tomolonius, has very "traditional" views when it comes to parenting roles and gender norms. When I returned to work, she did not respond kindly to me referencing being up all night (as a father to care for my newborn child) or that I had to handle other parenting duties.

19. Barbara did not provide the same negative responses to similarly situated female employees who routinely complained about common difficulties of parenting; those employees avoided parenting-related criticisms from Defendants.

20. When I returned from my paternity leave, I immediately noticed that I was being treated differently. Prior to my paternity leave, I had not received any written or verbal warnings.

21. When I returned on October 28, 2020, it took *less than two (2) weeks* for me to receive my first warning, which was a written warning.

### November 9, 2020 – Written Warning (Cellphone Use & Med Cart)

22. After I returned from paternity leave, I used my cell phone during work hours. My child had just been in the NICU for nearly a month. His health was being monitored closely by both medical providers and my family and I was required to be on standby for any potential emergency.

23. I was on my cellular phone more than usual as a result. My employer knew my child had just been in the NICU for an extended period.

24. Other female nurses *always* used their cellular phones during work hours for personal, family, and leisurely use. However, these nurses did not receive the same treatment and discipline as

me.

25. For instance, the nurses working the 3pm – 11pm shift are known to use their cellular phones ***all day and night*** without facing any discipline. 7 out of approximately 8 nurses who work this shift are female.

26. Notably, my supervisor, Barbara, is a notorious gambler. Multiple co-workers commented about her spending every weekend at a casino, e.g., Foxwoods or Twin River. Prior to my leave for paternity leave, ***<u>Barbara was using her cellphone at work to play mobile application casino games (i.e., slots)</u>***.

27. In the November 9, 2020, report, Defendants also mention that my medicine cart was left unlocked. This surprised me because I was very conscious of keeping my cart locked.

28. Other nurses I worked with never locked their cart. I do not believe that I left the cart unlocked when I received this discipline, which is why I did not sign off on the form that was presented to me.

29. I would remain in close proximity to the cart and therefore could attend to the cart. If it was to be unattended for any extended period, it was locked.

30. There were female nurses who regularly left their carts unlocked and unattended for the duration of their entire shift for "convenience." This was known and accepted by Defendants. I even observed female nurses "pre-pop" all their medications and leave their cart unlocked.

31. Supervisors, including Barbara, observed the same. However, only I was written up, and for less severe actions.

32. On November 9, 2020, I received a written warning for cell phone use and the medication cart. I also was immediately placed on a 90-day probation period for this action.

33. I was surprised to receive this written warning and level of discipline. While I knew I

used my cell phone during work hours, similarly-situated females used their cell phones during their work shifts, without reprimand. I was the only known nurse to receive this level of disciplinary action for the same action.

### November 2020 – Written Warning (Cellphone Use) – Cont'd, Signed – Kim Sheppard

34. I did not want to sign the written warning. Kim Sheppard, SDC, presented the document to me. She was in a senior role to me, but underneath Defendant Barbara as far as organization structure goes. Kim and I had a very cordial relationship.

35. While Kim presented the document, I knew this warning was directed by Barbara for a few reasons.

36. First, Barbara had already began to treat me differently since I became a father.

37. Second, Kim *told* me that Barbara was behind the written discipline.

38. I questioned whether I should sign it because I knew I was being treated differently from my peers. Kim begged me to just accept it and comply to "make [her] life easier."

39. Notably, Kim told me that if I signed the document, she would show it to Barbara, but then ***destroy it*** and *"not even include it in [my] file."*

40. I reluctantly signed the document. That same day, Kim later showed me the signed document. She instructed that I watch her as she walk towards the trash and discarded the document into the bin.

41. After that, Kim and I both joked about how the warning was clearly "bullshit" as everyone is constantly using their phones and committing similar actions as the nurses were simply doing their best.

42. After that, Kim and I both joked about how the warning was clearly "bullshit" as

everyone is constantly using their phones and committing similar actions as the nurses were simply doing their best.

### Beginning of February 2021 – State Health Dept. Investigation

43. Approximately the beginning of February 2021, I was questioned by the Commonwealth of Massachusetts during the State's health inspection and investigation following a patient fall at Defendant's facility.

44. During this investigation by the State, I was honest with the State and informed the State's investigator that our patient had fallen down the stairs, and the patient was able to make it all the way down to the first floor, unattended, before the fall occurred.

45. As a result of this, Brigham Health was required by the State to increase its security, including but not limited to attending to the unsafe stairway.

46. Additionally, Defendant, Barbara Tomolonius, my direct supervisor, was reprimanded via a 1-day suspension, which was issued by the State.

47. Shortly after Defendant Barbara received her suspension, she began retaliating against me, at least in part, because of my honest participation in the State's investigation which resulted in her suspension.

48. The same month as the State's investigation, Defendant Barbara disciplined me with a formal write up, for allegedly not following mask-wearing guidelines, even though other individuals had not followed guidelines and/or took mask-wearing breaks when they were not surrounded by anyone; exactly like I did.

49. Also within the same month as the State's investigation, Defendant Barbara disciplined me for tardiness, when I arrived in the building at the same time as other nurses who received no reprimand nor formal written discipline.

50. Two months from the State's investigation, I received a second, April 2021, written warning

51. Three months from participating in the State's investigation, my employment was involuntarily terminated; I was fired.

**February 10, 2021, Written Warning (Mask-wearing),
Unsigned – Barbara Tomolonius**

52. In February 2021, Defendants were providing employees with KN-95 masks. The U.S. government had not approved this type of mask; they approved N95 masks.

53. I was concerned about COVID-19 exposure, as I had a newborn at home and my wife had an underlying condition (diabetes) which puts her more at risk for severe illness than the general public, if she were to contract COVID-19.

54. At first, Barbara tried to make the fact that I was using a different mask than what was provided by my employer an issue, despite the fact that the mask I was using was authorized by our government.

55. Eventually, she let me use it. There was one instance where I was alone, at a workstation, and I took a break from wearing the mask that was difficult to breath in. When she noticed me, she immediately scolded me and later wrote me up for not wearing a mask.

56. Notably, I observed other female nurses who were allowed to take a mask break in the same manner without receiving the same reprimand or discipline. Based on this, and the fact that I was not surrounded by anyone and taking a short and necessary mask break, I refused to sign her written discipline.

57. After this incident, I observed other incidents where Barbara observed a female employee not wearing their mask, where she did nothing to equally address the situation.

58. For instance, on April 12, 2021, while at the same nurses' station, writing reports,

Barbara did not reprimand a female nurse who was not wearing her mask while at work. I intentionally saved the date of the incident within my cellphone because I started to see a pattern of other female nurses receiving different and better treatment.

### February 2021 Verbal Warning (Lateness/Tardiness)

59. At the end of the meeting for the February 2021 regarding the written discipline, I mentioned to Barbara that I had an attention deficit hyperactivity disorder (ADHD) disability.

60. Barbara verbally criticized me for my arrival to work, despite other employees, who to my knowledge did not suffer from ADHD, also arriving late to work.

61. I told Barbara that I did not want my disability to be an excuse. At the same time, it was something I consistently work on as it presents a challenge. I explained how even when you work well with ADHD, there are still moments that can be uncontrollable.

62. I discussed needing some flexibility in my schedule, specifically allowing my later arrival to not be reprimanded, as I could stay late to make up any work and just had some struggle with time in the morning. I offered to stay late at work on multiple occasions and others were arriving late on a regular basis and not making that same offer.

63. Out of approximately 15 nurses, only 1 or 2 of them regularly arrived on time. In fact, there were multiple employees who arrived late so regularly that they and I arrived in the parking lot and to our workstations at the same exact time. Yet, I was the only one receiving such criticism for lateness.

64. Employees who arrived late include, but are not limited to, "Martha Joe" (arrived at the same time as me, worked the same shift); "Diana" (arrived late, worked different shifts); "Gabby" (nurse, regularly late, arrived at same time as me); Kim Sheppard (supervisor, regularly late). None of these female nurses received similar adverse treatment than I did for lateness.

65. One female employee, who worked 3p-11p and came in to relieve me, *regularly* came in at least 25 minutes, and *up to one (1) hour late*. I was forced to stay late as a result. She was treated differently and more lenient (no discipline) that me.

66. When I received my discipline for tardiness, I addressed this with Barbara. Her response was that this employee was given leeway and *allowed to arrive late* because *"she has kids at home."*

67. Meanwhile, I was being written up for tardiness while I had a newborn at home. I constantly was less tardy, and more on time, than this female employee was, and we both had children we cared for at home. Yet, because I was male, my parental responsibilities were viewed and treated differently.

### April 9, 2021, Written Warning (Documentation, Meds)

### Unsigned – Barbara Tomolonius

68. On April 9, 2021, Barbara issued another written warning.

69. In this situation I was so busy dealing with this patient that I certainly admit the situation required better handling, in hindsight. The patient was a fall risk, and I was ensuring their safety in that respect, all day.

70. This was the first issue in this respect that I ever had related to documentation and medication at work.

71. Notably, when Barbara met with me regarding this, she made insulting and discriminatory remarks.

72. At this meeting, Barbara's intensity increased since the time I told her I suffered ADHD.

73. She consistently blamed my ADHD, as if she *wanted* it to be causing mistakes and

responsible for any imperfection she could allege of my work.

74. Barbara criticized my ability to be a good employee and a good parent saying it was "because I suffered from ADHD."

75. She made negative comments, alluding to my ADHD for everything. For instance, "I don't know if it was your ADHD but…" proceeded by a negative criticism of my work.

76. These comments were in the context of my disability, but they were also sex-based.

77. For example, "If you cannot handle behavioral patients, how are you going to parent and be a good father to your 2- or 3-year-old child?"

78. Other female employees made similar mistakes during my employment, and made them often. However, they were never questioned on their ability to be a parent/mother.

79. Likewise, similarly situated, non-disabled, employees never received this level of scrutiny of their work for any alleged mistake.

### April 9, 2021 - Reported Barbara to HR / Retaliation

80. After Barbara's consistent discriminatory sex- and disability-based negative comments, and constant disparate treatment in discipline compared to my peers, I made a formal report with HR.

81. I informed HR that I was being targeted by Barbara, as her discipline and comments were clearly disparate and discriminatory based on sex, gender, and disability.

### May 3rd – Patient Warns of Barbara's Plan

82. On May 3, 2021, a patient informed me that 2 nurses were speaking about myself and Barbara.

83. The patient informed me that Barbara **"HAD A PLAN TO GET RID OF ME."**

### May 4th – HR Retaliation (Suspension & Termination / Barbara Yells)

84. On May 4, 2021, HR called me in for a meeting. I thought the meeting was going to be to discuss my HR report about Barbara.

85. Instead, the meeting consisted of HR professionals who just stood there and observed as Barbara, who was also present, began yelling and screaming at me.

86. Barbara was disparaging my character as a person and professional.

87. Barbara began yelling.

88. I asked HR why they would not intervene. I informed them that this felt retaliatory in nature. I had just filed a report against Barbara. Right after, I was being suspended for 3 days with the possibility of termination.

89. After HR allowed the yelling to continue, I eventually raised my voice as well because I felt outnumbered and retaliated against. This continued until I made the decision to walk away from the situation and I left the room.

90. On May 6, 2021, Defendants terminated my employment.

91. Barbara separated herself from the termination by allowing Laurie Bouchard, someone who I interacted with for the very first time on May 4th, the same day of the HR meeting.

92. Laurie Bouchard has no first-hand personal knowledge surrounding the events that led to my termination. Barbara was my direct supervisor and the individual directing my discipline.

*Retaliation*

93. At all relevant times, I complained to Defendants about sex-, gender-, and disability-based discrimination in our workplace against myself.

94. Under Title VII and FEPA, I am expressly protected from retaliatory conduct by an employer for voicing my concerns of ongoing sex/gender/disability discrimination with regard to myself and/or other individuals in the protected class.

95. When I reported what I believed there to be sex/gender/disability discrimination, I was engaged in a protected activity.

96. After engaging in the above-mentioned protected activity, I was repeatedly harassed and discipline escalated, leading to the involuntary termination of employment.

### *Disability Discrimination*

97. Additionally and/or in the alternative, the circumstances of my discharge clearly establish a prima facie case of disability discrimination under applicable law insofar as: (1) the medical conditions from which I was suffering qualify as disabilities under applicable law; (2) I was qualified to perform the essential functions of my job with or without a reasonable accommodation; and (3) Defendants failed to accommodate me and treat me equal to my non-disabled peers due to my disability and/or because Defendants regarded or perceived me as having an impairment and/or because there was a record of my impairment.

98. At all relevant times, disabilities substantially limited one or more major life activities, including the ability to concentrate, eat, sleep, and work.

99. On information and belief, Defendants replaced me or had my duties assumed by one or more worker(s) who are/were neither disabled nor perceived as being disabled.

100. I was reprimanded when I arrived late to work even when I made up the time by staying late, and others regularly were late and not reprimanded.

101. Pretext may also be established where, as here, an employer fails to follow its own policy and procedures relative to, among other things, employee attendance and discipline with others.

### *Failure to Provide Reasonable Accommodation*

102. At all relevant times, Defendants were aware that I had need of a reasonable

accommodation due to my disability in the form of a flexible work schedule.

103. Rather than provide the very reasonable accommodation that I sought, Defendants instead denied my requested accommodation and frequently harassed me due to my disability and/or because Defendants regarded or perceived me as having such an impairment and/or because there was a record of my impairment.

104. Additionally, Defendants retaliated against me for needing and/or requesting a reasonable accommodation (in the form of brief leniency or permission to work late to make up for tardiness due to my disability) or other reasonable accommodation.

105. The temporal proximity of adverse conduct against me in relation to my request for a reasonable accommodation also supports an inference of discriminatory intent.

### *Individual Liability of Barbara Tomolonius*

106. Respondent Barbara Tomolonius is individually liable pursuant to M.G.L. c. 151B §§ 4, 4A, and 5 for the acts and/or omissions/failure to act alleged herein.

107. At all relevant times, Respondent Barbara was my direct supervisor with direct control over my employment.

108. At all relevant times, Respondent Barbara had authority or a duty to act on Defendants behalf to prevent the unlawful acts or commissions alleged herein.

109. At all relevant times, Respondent Barbara's acts and/or failure to act as alleged herein directly implicated my rights under M.G.L. c. 151B as alleged herein.

110. At all relevant times, Respondent Barbara's unlawful acts and/or failure to act as alleged herein were in deliberate disregard of my rights under M.G.L. c. 151B as alleged herein.

111. At all relevant times, Respondent Barbara intentionally discriminated and/or retaliated against me in the manner alleged herein because I opposed practices forbidden under

M.G.L. c. 151B.

112. At all relevant times, Respondent Barbara intentionally coerced, intimidated, threatened, and/or interfered with my exercise or enjoyment of rights to be free from discrimination, a hostile workplace, and retaliation and to receive reasonable accommodation under M.G.L. c. 151B in the manner alleged herein and/or because I exercised rights under M.G.L. c. 151B in the manner alleged herein.

113. At all relevant times, Respondent Barbara intentionally aided, abetted, incited, compelled, or coerced Respondent and its agents or employees in the unlawful discrimination, hostile workplace, and retaliation that I was subjected to and denial of my right to receive reasonable accommodation in the manner alleged herein.

### *Motivation to Discriminate and/or Retaliate*

114. Adverse employment action based in whole or even in part on account of sex and/or gender and/or disability constitutes prohibited discrimination.

115. An unwarranted termination is an adverse employment action that gives rise to a compelling inference of discriminatory animus.

### VI.   Claims for Relief

116. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 141 of this Complaint in each of the counts below with the same force and effect as if set forth therein.

### Count One

### *Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq.*

117. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment discrimination based

on the sex and gender of Plaintiff and/or retaliated against Plaintiff for engaging in protected activity in violation of Title VII, and thereby deprived him of rights secured under Title VII, causing Plaintiff to suffer damages as aforesaid.

### Count Two
*Americans with Disabilities Act of 1990,*
*42 U.S.C. § 12101, et seq. ("ADA")*

118. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment discrimination based on disability of Plaintiff and/or retaliated against Plaintiff for engaging in protected activity in violation of the ADA, and thereby deprived him of rights secured under ADA, causing Plaintiff to suffer damages as aforesaid.

### Count Three
*Massachusetts Fair Employment Practices Act,*
*M.G.L. c. 151B § 1, et seq. ("FEPA")*

119. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment practices against Plaintiff based on his sex, gender, and/or disability and/or retaliated against him for engaging in protected activity in violation of the FEPA, and thereby and otherwise deprived him of rights secured under the FEPA, causing him to suffer damages as aforesaid.

### Count Four
*Massachusetts Health Care Whistleblower Act ("HCWA"),*
*M.G.L. c. 149 § 187, et seq.*

120. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment practices against Plaintiff, including violations of the Massachusetts Healthcare Whistleblower Act, including but not limited to unlawfully retaliating against him for engaging in protected conduct in violation of

the HCWA, and thereby and otherwise deprived him of rights secured under the HCWA, causing him to suffer damages as aforesaid.

## VII. Prayers for Relief

**WHEREFORE**, Plaintiff prays that this Honorable Court grant the following relief:

1. A declaratory judgment declaring that the acts and/or omissions of Defendants, including, but not limited to those complained of herein, are in violation of Title VII, FEPA, ADA, and the Massachusetts HCWA;

2. An injunction directing Defendants to take such affirmative action as is necessary to refrain from such conduct as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated;

3. An injunction or other equitable relief, including, but not limited to, an award of back pay, front pay or reinstatement, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for violations;

4. An award of compensatory damages;

5. An award of liquidated damages;

6. An award of exemplary and/or punitive damages;

7. An award of prejudgment interest, reasonable attorneys' fees, and costs; and

8. Such other and further relief as this Court deems just and proper.

## VIII. Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## IX. Designation of Trial Counsel

Plaintiff hereby designates Olayiwola O. Oduyingbo, Esq., as trial counsel.

                                                    Respectfully submitted,

                                                    **ODU LAW FIRM, LLC**

**Date:  1/24/2023**                          ***/s/ Olayiwola O. Oduyingbo***
                                                    **Olayiwola Oduyingbo, Esq. (MA BBO #691768)**
                                                    888 Reservoir Avenue, Fl. 2
                                                   Cranston, RI 02910
                                                   Phone: (401) 209-2029
                                                   Fax:    (401) 217-2299
                                                   odu@odulawfirm.com
                                                   **ATTORNEY FOR PLAINTIFF**